UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: | CASE NO. 06-10179 |
| OCA, INC. et al. | SECTION "B" |
| DEBTORS | CHAPTER 11<br>Jointly Administered |

*************************************************************************

GARY D. SEXSON, II and
SEXSON ORTHODONTICS, LTD.
    Plaintiffs

VERSUS                                                                         ADV.P. NO. 06-1126

ORTHODONTIC CENTERS OF ILLINOIS, INC. and
OCA, INC.
    Defendants

## MEMORANDUM OPINION

This matter came before the court on June 12 and 13, 2007 on the complaint of Dr. Gary D. Sexson, II and Sexson Orthodontics, Ltd. ("Dr. Sexson") against the debtors, Orthodontic Centers of Illinois, Inc. and OCA, Inc. ("OCA") and OCA's counterclaim against Dr. Sexson. For the reason set forth below, the court denies all claims of Dr. Sexson. The court finds that Dr. Sexson owes OCA $301,478 for the loans OCA made to Dr. Sexson for work done on the Schaumburg and Rockford offices. The court further finds that Dr. Sexson owes OCA $21,411 on the promissory note. Finally, the court finds that OCA is entitled to take possession of its assets that are being used by Dr. Sexson within thirty days of the date of this opinion and the related judgment. All of the other claims of the parties are dismissed.

**I.**     **Background Facts**

The debtor, OCA, is a company that provides services to affiliated dental practices

through separate subsidiaries that operate in each state where there is an affiliated practice. The basic business model of OCA and its subsidiaries is that they enter into business services agreements ("BSAs") with affiliated dental practices, primarily orthodontic practices. OCA generally provides the necessities for starting up and running a dental practice, i.e., office space, equipment, trained office staff, and computer software for managing the practice. In exchange the affiliated practice pays a monthly service fee based on a percentage of the practice's net profits.[1] These BSAs are the primary operating asset of OCA and are the means through which it generates its revenue.

OCA and most of its subsidiaries filed Chapter 11 petitions under the Bankruptcy Code on March 14, 2006.[2] A small number of additional subsidiaries filed Chapter 11 petitions on March 17, 2006 and June 2, 2006. All of the 51 subsidiary debtors' cases have been consolidated and are being jointly administered with the main case.[3]

Dr. Sexson first entered into a business relationship with OCA on November 1, 2000 when the parties entered into a BSA.[4] The BSA provided that OCA would provide services to two offices in Illinois already owned by Dr. Sexon, one in Rockford and one in Long Grove. The BSA further provided for the development of a third office in Crystal Lake. Thereafter, Dr. Sexson contracted with Dr. Christine Michaels, another OCA affiliated orthodontist, to purchase

---

[1] In this case the monthly service fee was 40% of the net operating profits of Sexson's practice.

[2] See title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*

[3] For simplicity, when the court refers to OCA or the debtor, the court means all of the 52 debtor companies collectively unless it specifically enumerates an individual company.

[4] Exhibit 1.

as a fourth office in Illinois, her practice in Schaumburg, which was already open and operating. In connection with this purchase, Dr. Sexson agreed to assume debt that Dr. Michaels owed to OCA by executing a promissory note in the amount of $93,150.[5] Dr. Sexson operated out of the Schaumburg office for approximately three years, and in 2004 Dr. Sexson decided to relocate that office to a better location.[6] Additionally, Dr. Sexson decided to remodel the Rockford office.

On March 19, 2004 and again on August 20, 2004, Dr. Sexson and OCA executed amendments to the BSA (the "Amendments"). The Amendments provided for the development of two more Illinois offices, one in DeKalb and one in McHenry; it also provided the terms of the financing for those offices, which was to be split between Dr. Sexson and OCA. In October 2005 Dr. Sexson and OCA began negotiations to end their business relationship, and in December 2005 they reached an agreement whereby Dr. Sexson would pay OCA $1.8 million dollars to terminate the BSA and its amendments. The parties did not actually execute the agreement, and Dr. Sexson never paid the $1.8 million. Instead, as of January 1, 2006 Dr. Sexson stopped making payments under the BSA. Two and a half months later OCA filed its Chapter 11 petition, and then Dr. Sexson filed his complaint initiating this adversary proceeding.

Dr. Sexson's complaint alleges that the BSA between OCA and Dr. Sexson constituted the unauthorized practice of dentistry in Illinois, as such the BSA was null and void, and the $1,166,865.75 that OCA had collected from Dr. Sexson during the five years that OCA provided its services should be returned to Dr. Sexson. Dr. Sexson further claims that after he and OCA

---

[5] Exhibit 7.

[6] Trial transcript of June 12, 2007 at pp. 21-22.

had ended their relationship, $2,064 was deposited into a lockbox over which OCA had control, and that OCA was not entitled to this money. Finally, Dr. Sexson claims that OCA retained $22,749.01 that was supposed to be used to pay for services supplied to Dr. Sexson's practice and that OCA did not pay for those services but retained the money.

OCA's counterclaim alleges nine causes of action: breach of contract, conversion, unjust enrichment, fraudulent conveyance under sections 548 and 550 of the Bankruptcy Code, , a claim for quantum meruit, a request for declaratory relief, specific performance and reformation of the contract, promissory estoppel, an action on an account stated, and finally, a request for attorneys' fees and costs. By order dated January 4, 2007 (P-35) the claim of promissory estoppel was stricken, and at trial OCA withdrew its claim for an action on an account stated.

By order dated January 24, 2007 the court granted motions for summary judgement in this and several related cases and held that the BSA was illegal under Illinois law. This ruling was based primarily on the decision of a federal district court sitting in Illinois, *Orthodontic Centers of Illinois, Inc. v. Michaels*, 403 F.Supp.2d 690 (N.D.Ill. 2005), where that court found a similar BSA between an OCA subsidiary and an Illinois doctor illegal because it violated the Illinois Dental Practice Act. Thus, the issue remaining for trial in this case is what remedies, if any, were available for parties to an illegal contract under Illinois law.

**II.     Legal Analysis**

The *Michaels* court addressed the question of what to do with a BSA that was illegal under Illinois law, and this court finds its analysis helpful.

> Under Illinois law, "when a statute declares that it shall be unlawful to perform an act and imposes a penalty for its violation, contracts for the performance of an act are void and incapable of enforcement." As *Ransburg v. Haase* teaches:

4

>As a general rule, courts will not enforce a contract involving a party who does not have a license called for by legislation that expressly prohibits the carrying on of the particular activity without a license where the legislation was enacted for the protection of the public, not as a revenue measure.
>
>Here the Act confirms all of those criteria. It both declares it unlawful for a corporation to hold itself out as owning and operating a dental office and imposes a criminal punishment for its violation. And the Act also states unambiguously that the regulations it contains are motivated by a desire to serve the public interest. Thus the Agreement, the mechanism through which Orthodontic Centers engages in its business and the basis on which it holds itself out unlawfully as being engaged in an orthodontic practice, is void and incapable of enforcement.
>
>Almost without exception, parties to such a void contract will be left where they have placed themselves. It is true that in a context wholly different from the present one Illinois caselaw has recognized two limited exceptions to that rule: (1) where the parties are not in pari delicto (that is, where the party seeking relief is not similarly culpable) or (2) where the law that makes the contract unlawful is intended for the protection of the party seeking relief.[7]

In the case before this court, the parties both argue an exception to the *in pari delicto* defense, although they take different approaches. Dr. Sexson argues that he is not equally at fault with OCA, and therefore, the first exception noted above by the *Michaels* court applies to him. He testified that prior to signing the BSA, he contacted an attorney to determine if he could legally sign the agreement, and his attorney answered affirmatively.[8] Dr. Sexson states that OCA does not claim to have contacted an attorney or received a legal opinion as to the legality of the agreement prior to entering into the BSA with him.[9] Dr. Sexson's argues that these facts lead to a conclusion that he is not *in pari delicto* with OCA, and as the less culpable party, he should be allowed to enforce the agreement and recover all of the fees he paid to OCA over the

---

[7] *Michaels* at 698-699 (internal citations omitted).

[8] Trial transcript of June 12, 2007 at pp. 17-18.

[9] Trial transcript of June 12, 2007 at p. 242.

5

course of their business relationship. Dr. Sexson's argument misses the mark. To succeed in using this defense, Dr. Sexson must show that he had no knowledge that the agreement was illegal, which he did. He must also show, however, that OCA did have knowledge that the agreement was illegal, and he did not prove this.[10] The evidence at trial shows that OCA did not know the BSA violated the Illinois Dental Practice Act. Before engaging in business in a particular state, OCA checked with its attorneys about the legality of the arrangements it entered into for that state. Indeed, Dr. Sexson does not contend that OCA knew the arrangement was illegal, only that it did not check with its legal counsel prior to entering into the BSA with him as thoroughly as he did. Dr. Sexson's witness, Dr. Irving R. Lester, a former recruiter for OCA, testified under cross examination that OCA went out of its way when recruiting an affiliate practice to make sure it was complying with the law of the state concerned.[11] He also testified that he did not make any inquiries prior to recruiting Dr. Sexson because OCA already had an affiliate practice in Illinois, and prior to December 2005 - the date of the *Michaels* opinion - there were no questions raised as to the legality under Illinois law of the BSA arrangement that OCA used with affiliated practices.[12] Thus, Dr. Sexson's argument that he was not *in pari delicto* fails.

OCA also argues an exception to the *in pari delicto* rule, but not one of the exceptions recognized by the *Michaels* court. OCA claims that it falls under what it calls the "innocent successor" exception to the rule, citing the United States Court of Appeal for the Seventh

---

[10] *Michaels* at 701; *O'Hara v. Ahlgren, Blumenfeld & Kempster*, 511 N.E.2d 879, 882 (Ill.App. 1 Dist., 1987).

[11] Trial transcript of June 12, 2007 at pp. 257-60.

[12] Trial transcript of June 12, 2007 at pp. 239-42.

Circuit's ruling in *Scholes v. Lenmann*, 56 F.3d 750 (7th Cir. 1995). In *Scholes* the receiver for several corporations whose principal was involved in a Ponzi scheme brought fraudulent conveyance actions against defendants that had received funds from the corporations. The defendants argued that the corporations, through which the principal had perpetrated his fraud, could not recover the funds because they were *in pari delicto* with the defendants. The Seventh Circuit held that under these circumstances the receiver could bring the fraudulent conveyance actions because the removal of the principal who had committed the fraud also removed the reason for the rule of *in pari delicto*:

> Though injured by Douglas, [the principal] the corporations would not be heard to complain as long as they were controlled by him, not only because he would not permit them to complain but also because of their deep, their utter, complicity in Douglas's fraud. The rule is that the maker of the fraudulent conveyance and all those in privity with him-which certainly includes the corporations-are bound by it. But the reason, of course, as the cases just cited make clear, is that the wrongdoer must not be allowed to profit from his wrong by recovering property that he had parted with in order to thwart his creditors. That reason falls out now that Douglas has been ousted from control of and beneficial interest in the corporations. The appointment of the receiver removed the wrongdoer from the scene.
>
> * * *
>
> Put differently, the defense of *in pari delicto* loses its sting when the person who is *in pari delicto* is eliminated. Now that the corporations created and initially controlled by [the principal] are controlled by a receiver whose only object is to maximize the value of the corporations for the benefit of their investors and any creditors, we cannot see an objection to the receiver's bringing suit to recover corporate assets unlawfully dissipated.[13]

OCA also suggests that *In re Edgewater Medical Center*, 332 B.R. 166 (Bankr.N.D.Ill 2005), support its "innocent successor" argument. *Edgewater* concerned a hospital that had been used

---

[13] *Scholes* at 754-55.

by its management company to defraud Medicare. When the fraud was discovered, a receiver was appointed for the hospital; shortly thereafter a custodian was appointed who then filed a petition for relief under Chapter 11 of the Bankruptcy Code. The custodian, acting as debtor in possession for the hospital, filed a complaint against the management company and moved for summary judgment on three counts of the complaint: breach of fiduciary duty, breach of contract and indemnification. The management company asserted, albeit in an incorrect procedural manner, the affirmative defense of *in pari delicto*. The court analyzed the matter under section 541(a) of the Bankruptcy Code, which provides that with a few exceptions, property of the bankruptcy estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." The court held that because the receiver had been appointed prior to the filing of the bankruptcy petition, the reasoning in *Scholes* was applicable, because "the appointment of a receiver alters the defenses to which a corporation is subject by removing the wrongdoer from the scene for purposes of *in pari delicto*."[14] The *Edgewater* court found that the debtor in possession was not subject to the equitable defense of *in pari delicto* because the receiver would not have been subject to that defense, and therefore, neither would the custodian who filed the bankruptcy on behalf of the corporation.[15]

Although *Scholes* and *Edgewater* do hold that the *in pari delicto* defense does not apply where a receiver has been appointed, they do not go so far as to support the OCA's proposition that a debtor in possession is exempt from that defense. OCA does not cite, and this court could not find, any case that squarely holds that a debtor in possession or a trustee in a bankruptcy

---

[14] *Edgewater* at 177.

[15] *Edgewater* at 178.

where a receiver was not appointed before the filing of the bankruptcy petition is not subject to the defense of *in pari delicto*.[16] In fact, two U.S. Courts of Appeal have examined that question and specifically held that the "innocent successor" defense is not available to a bankruptcy trustee.[17] The court finds that OCA's argument that it is excepted from the *in pari delicto* defense fails.

The court next looks to what remedies may be appropriate given that it finds the parties are equally at fault in entering into the illegal contract. The *Michaels* court held that because the BSA was illegal, only debt that could be proved through means other than the BSA could be collected. In the *Michaels* case, the OCA subsidiary held five promissory notes signed by Dr. Michaels, and they were held to be enforceable. The court allowed recovery on those notes finding that they were separate from the BSA:

> It is undisputed that the notes stemmed from an early stage in the parties' relationship, reflecting the obligation to repay amounts advanced by Orthodontic Centers to facilitate Illinois-licensed orthodontist Dr. Michaels' establishment of her own practice. They were not reflective of fees or other payments due to Orthodontic Services for its services under the Agreement or otherwise. Because the creation of Dr. Michaels practice was of course perfectly legal under the Act, the promissory notes can be enforced by Orthodontic Centers so long as it can establish its claim without the aid or proof of the illegal contract.[18]

---

[16] OCA cites many other cases, but those cases just do not support its argument.

[17] *Nisselson v. Lernout*, 469 F.3d 143 (1st Cir. 2006) (no "innocent successor" exception available to a bankruptcy trustee in a case in which the defendant successfully could have mounted an *in pari delicto* defense against the debtor corporation); *Official Committee of Unsecured Creditors v. Edwards*, 437 F.3d 1145 (11th Cir. 2006) (bankruptcy trustee stands in the shoes of the debtor and acquires no greater rights than those of the debtor; if a claim by the debtor would have been subject to the defense of *in pari delicto* at the commencement of the bankruptcy, then the same claim asserted by the trustee is subject to the same affirmative defense).

[18] *Michaels* at 700 (internal citations omitted).

9

Following the reasoning in *Michaels,* this court will analyze the various claims of the parties with an eye to whether the BSA is required to prove the claim, or if the claim was proved at trial by other, independent means.

First, the court addresses the claims that clearly are not recoverable because they are without doubt directly related to the BSA. These are the claims related to fees for services provided by OCA to Dr. Sexson pursuant to the BSA. OCA makes a claim for $1,529,109 for uncompensated value of the benefits conferred to Dr. Sexson through the BSA. OCA admits in its brief that if the court does not find that it falls under an exception to the *in pari delicto* defense discussed above, OCA cannot recover on this claim. Therefore, the court finds that OCA cannot recover on this claim.

Second the court turns to Dr. Sexson's claim that OCA inadequately performed the services it contracted to provide to Dr. Sexson under the BSA, and because of OCA's performance, Dr. Sexson lost profits in the amount of $1,011,250. This claim is also completely dependent on the BSA, and the court finds that Dr. Sexson cannot recover on this claim. Also, Dr. Sexson claims that during the course of his affiliation with OCA, he paid $1,154,616 to OCA under the terms of the BSA. Dr. Sexson seeks to recover this amount under the theory that because he was not *in pari delicto* with OCA, he should be able to recover the amounts he paid to OCA in fees while the parties were operating under the agreement. Dr. Sexson cites no support for this proposition. In any event, the court found that Dr. Sexson was *in pari delicto* with OCA and further finds that Dr. Sexson cannot recover on this claim.

Next, the court examines the promissory note signed by Dr. Sexson when he purchased

the practice in Schaumburg from Dr. Michaels.[19]  The note was originally for $93,150.00, but the testimony at trial showed that Dr. Sexson has made payments on the note.  OCA's representative, Michael Gries, testified that the balance on the note was $21,411.[20]  Dr. Sexson testified that he believed he owed approximately $21,000 on the note.[21]  The note is separate from the BSA, and the court finds that the note and the testimony are sufficient evidence that Dr. Sexson owes OCA $21,411 on the note.  The note also calls for 8% interest per annum.  The court finds that Dr. Sexson is liable for interest on the note from the date of the last payment made on the note until the note is paid in full according to the terms of the note.

Dr. Sexson makes a claim that OCA misappropriated $121,346 from his practice.  Dr. Sexson relies on the testimony of his expert witness Harold Asher for this assertion.  The expert report Asher prepared that accompanied his testimony was not admitted into evidence at trial because the report was not included on the exhibit list in the joint pre-trial order filed by the parties.  The court finds that Mr. Asher's testimony alone does not sufficiently prove Dr. Sexson's claim that $121,346 was misappropriated from his practice.  Additionally, Asher's testimony was controverted by the testimony of Michael Gries, the chief restructuring officer for OCA.  Thus, the court need not engage in an analysis of whether such a claim was related to the BSA or not; the court denies this claim for lack of sufficient evidence.

OCA claims that it is entitled to recover $278,816 that it loaned to Dr. Sexson for purposes of relocating his Schaumburg office.  At trial, OCA introduced evidence to support this

---

[19] Exhibit 7.

[20] Trial transcript of June 13, 2007 at p. 20

[21] Trial transcript of June 12, 2007 at p. 101.

claim in the form of testimony from Mr. Gries and Dr. Sexson. Mr. Gries testified that the records of OCA reflected that Dr. Sexson owed $278,816 to OCA, reflecting the amount OCA spent to relocate the Schaumburg office.[22] Dr. Sexson testified that he had agreed to pay for 60% of the expenses for the relocation, and that $279,000 was probably a correct representation of the amount he had agreed to pay for the relocation.[23] These expenses were incurred in the relocation of an office for Dr. Sexson, and were not related to fees for services under the BSA, and OCA was able to prove this claim independently through testimony. All the evidence shows that there is nothing in the BSA or the amendment about relocating an affiliate office.[24] Thus, the court finds that Dr. Sexson owes OCA $278,816 for the money it loaned Dr. Sexson to relocate his Schaumburg office.

OCA also claims that it is entitled to recover $22,816 that it loaned to Dr. Sexson so that he could remodel his Rockford office. The evidence offered by OCA to prove this claim is the same as the evidence it offered to prove the loans made for the Schaumburg office. Mr. Gries testified that the records of OCA showed that Dr. Sexson owed $22,662 to OCA because OCA had loaned him that amount to remodel the Rockford office.[25] Dr. Sexson testified that this figure sounded about right to him.[26] This loan was incurred for the remodeling of Dr. Sexson's Rockford office and was not related to the service fees in the BSA, and OCA was able to prove

---

[22] Trial transcript of June 13, 2007 at p. 24.

[23] Trial transcript of June 12, 2007 at pp. 82 & 101-02.

[24] Dr. Sexson also admitted this on cross-examination. Trial transcript of June 12, 2007 at pp. 81-83.

[25] Trial transcript of June 13, 2007 at p. 24.

[26] Trial transcript of June 12, 2007 at p. 104.

12

this claim independently through testimony. Thus, the court finds that Dr. Sexson owes OCA $22,662 for the remodeling costs of the Rockford office.[27]

OCA claims that it is entitled to recover $54,308 in loans called "shortfall advances" that it made to Dr. Sexson. OCA defines shortfall advances as obligations that arise when claims against the cash flow of Dr. Sexson's practice exceeded the money available for distribution in the bank accounts managed by OCA. When this happened, OCA would advance money to cover the cost of Dr. Sexson's practice expenses. OCA also claims that it is entitled to recover $63,420 in compensation advances made to Dr. Sexson. OCA states that when Dr. Sexson's practice did not generate enough money to cover Dr. Sexson's salary, then OCA would make a compensation advance so that Dr. Sexson would receive the full amount of his salary. Although Mr. Gries testified that these amounts were based on the records of OCA, Dr. Sexson disputed these amounts. These claims are also much more closely related to the service fees and the BSA because they are for amounts advanced to Dr. Sexson to pay practice expenses and his salary. The court finds that insufficient evidence was offered to prove them independently of the BSA. The court will not allow recovery for these claims.

Finally, OCA claims that it is entitled to the book value of the assets that it purchased for use by Dr. Sexson in his practices, some of which Dr. Sexson continues to use; OCA claims the book value of these assets total $1,326,057. In his post-trial brief Dr. Sexson disputes that he should have to pay OCA's calculated book value for the assets, but he does not dispute that the assets belong to OCA. The court does not agree with OCA's argument that Dr. Sexson should

---

[27] OCA's brief claims the amount owed is $22,816, but Mr. Gries's testified that the amount was $22,662; the court will accept the figure given by Mr. Gries that was entered into evidence, and not the amount stated in the brief.

be required to pay OCA for the assets, but the court also does not find that Dr. Sexson should be able to continue to use OCA's assets in his practice. Therefore, the court holds that OCA has the right to take possession of the assets in which ownership is vested in OCA that are being used by Dr. Sexson within thirty days from the date of the judgment accompanying this memorandum opinion. If the parties choose to come to some other arrangement before then, that is between them and is not the concern of this court.

### III.    Conclusion

The court finds that Dr. Sexson owes OCA the following amounts:

1) $21,411 on the promissory note plus 8% interest from the date of the last payment until paid;

2) $301,478 plus interest at the federal judicial rate from the date of this judgment until paid consisting of:

   a) $278,816 for the money loaned to him by OCA to relocate the Schaumburg office; and

   b) $22,662 for the money loaned to him by OCA to remodel the Rockford office.

Finally, the court finds that OCA is entitled to take possession of its assets that are being used by Dr. Sexson within thirty days from the date of this opinion and the related judgment. All of the other claims of the parties are dismissed.

New Orleans, Louisiana, April 8, 2008.

*J. A. Brown*
Jerry A. Brown
U.S. Bankruptcy Judge